Miles G. Dobbins *et al.*, plaintiffs in error, *vs.* A. Porter and Wallace Cumming, assignees, defendants in error.

When a bank made an assignment of its assets for the benefit of its cred itors, and a large portion of the assets was in money, and securities convertible into money, at a market value, and a creditor, nearly twelve months after the assignment, filed a creditor's bill, charging that, six months after the assignment, and again, shortly before the filing of the bill, he had demanded his share of the cash assets from the assignees, and they had refused to pay him, unless he would release the bank from the whole of his claim, and the bill prayed an account :

*Held*, that the bill was not demurrable.  If there was complication or cause for further delay, it ought to be set up by way of defence; it cannot be assumed.

Judgment reversed, on the ground that the Court erred in sustaining the demurrer to the bill, it being the opinion of this Court that, under the circumstances stated, the bill was properly filed.

Equity.   Demurrer.   Decided by Judge Schley.   Chambers.   Chatham county, November, 1868.

The Bank of the State of Georgia, a corporation of said county, had suspended.   Public notice of their intention having been given, a meeting of the stock-holders was held

on the 3d of May, 1866. A majority of the stock being there represented, it was resolved that the board of directors should make a deed of assignment, conveying to said Porter and said Cumming all of the assets of the bank, for equal distribution among the creditors and bill-holders, according to law. Accordingly, on the 25th of May, 1866, such deed was made, conveying all the property, real, personal and mixed, to said assignees, in special trust, to "forthwith take control and possession of the estate, property and funds assigned and conveyed, and, within a convenient time, convert the same into money, either at public or private sale, as may seem best, and collect all the debts due to said bank," etc. After the conversion of the said property into cash, and after the collection of the debts due to the bank, and after the payment of expenses, commissions, attorney's fees, etc., they were to pay out and distribute the proceeds of such sales and collections, and all other funds in their hands, among the creditors of the bank, in the order and according to the priority prescribed by law. Or they might make a partial distribution of the assets, or part payment to the creditors, before the whole of the property was converted into money, if the assignees, or the survivors of them, thought this advisable.

The assignees accepted the trust and took possession of said property. Part of this property was (as shown by the schedule attached to the deed) $7,071 23 in United States currency, $210,041 34 in gold coin, $17,135 31 in silver coin, $100 00 in copper coin, in sterling exchange about $8,000 00, in bonds and promissory notes, payable in coin, $14,150 00, and the following stocks and bonds: eighty-five shares of the Augusta and Savannah Railroad Company, $8,500 00; twenty-one bonds of Pensacola and Georgia Railroad Company, $21,000 00; seventeen shares of Muscogee Railroad Company, $8,500 00; two shares of the Alabama and Florida Railroad Company, $2,000 00.

On the 10th of April, 1867, Miles G. Dobbins and Wm. and R. J. Lowry filed their bill against said assignees, as such, in behalf of themselves and such other creditors as would join in the litigation and pay their part of the ex-

penses of the same.  They averred that they held $5,000 00 in the bills of said bank, (which were described,) that the bank was insolvent and made the assignment aforesaid ; that the assignees took possession of all its assets and property under said assignment, and had sold part of said property, but had made no distribution of the same, or of any part thereof. .

When these complainants were informed of said assignment, their attorney called at the bank, to-wit: in November, 1866, and asked of Cummings, what the assignees were doing or would do for the bill-holders of said bank, to which he replied, that they were not paying them anything, as they had advertised, for six months, for all bill-holders to present their bills,. and as these complainants had not presented theirs within that time, they had lost their preference over other creditors.  The counsel, without agreeing that that was so, and insisting that it was not, asked him to pay to complainants their *pro rata* share of the money in the hands of the assignees, counting all claims against the bank, and giving complainants no preference or priority.  Cummings refused to do this, unless the attorney would release the bank from any other payment, except such as might be realized from the assets in the hands of the assignees.  This the attorney refused to do.

Again, on the 10th of April, 1867, the attorney made another demand upon said Porter, (who was absent when the former demand was made,) offered to give him an exact descriptive list of the bills held by complainants, or to receipt on each bill for the amount paid on it, or give any other receipt which the assignee might wish for what he got, and Porter refused to pay anything, unless such release was given.

Because of all this, they prayed that said assignees should fully discover what they had done with said property and assets, how much was due to bill-holders, how much to all the creditors, etc., etc., and should account and settle with complainants, and that, if the Chancellor thought best, a Receiver should be appointed to take charge of the same, etc., etc.  To this bill, a general demurrer was filed.  After argu-

ment had, the Chancellor sustained the demurrer, and this is assigned as error.

WM. DOUGHERTY for plaintiffs in error.

JACKSON, LAWTON & BASSINGER, for defendants in error.

McCAY, J.

This bill charges that in May, 1866, the Bank of the State of Georgia made an assignment of its assets, for the benefit of its creditors, to the defendants; that they accepted the same; that among the assets was $210,000 in gold coin, $17,135 in silver, $800 in sterling exchange, and $100 in copper coin, a considerable amount of stocks and bonds, with a market value. The complainant is a bill-holder for $5,000. In November, 1866, complainant called at the bank, saw one of the assignees, and asked for payment. It was refused. He then asked for his *pro rata* share of the cash assets, and was refused, unless he would release the bank from any other payment. He called again in August, 1867, and got the same answer, whereupon he filed his bill in his own behalf, and in behalf of the other creditors. This bill was demurred to, and the demurrer was sustained.

This demurrer was sustained, as it appears, solely on the ground that the facts, as stated, did not show any right in the plaintiff to call the defendants to account, that they did not appear to be in *laches*. Why could they not have paid out the coin *pro rata* immediately? Why not sell the bonds and stock and exchange and banking house, and realize and pay the proceeds of that out? They have had nearly a year. If there were any complications or disputes, as to preferences, it does not appear. It was very easy for them to know the liabilities of the bank and the character of the claims. Why keep this large amount of cash assets idle? If there are any reasons, why so reasonable and business-like a proceeding as an immediate application of these cash assets to the debts should not take place, it ought to appear by answer.

Besides, we are not sure that the demand made by the

assignee of a release from this creditor, or a proffer to pay his *pro rata* if he did release, was not itself a breach of the trust. It was not one of the terms of the assignment. These assignees are emphatically the trustees of the creditors, and they have no right to use the assets, to secure a favor to the assignor.

At any rate, the bill was not demurrable. The discretion given by the deed to the assignees, to make a *pro rata* distribution at their option, is not an arbitrary discretion. It is their duty to exercise it, if it be proper to be done. So far as appears by the bill, it was eminently proper; if there exist good reason against it, that is matter of defence, and ought affirmatively to appear.